UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>JESSE A. BRUCE,<br><br>　　　　　Defendant. | 5:15-CR-50153-JLV<br><br>REPORT AND RECOMMENDATION |

Pending is Defendant's Motion to Suppress Statements and Evidence (Doc. 24). A hearing was held on May 25, 2016. Defendant was personally present and represented by his attorney of record, George E. Grassby. The Government was represented by Ted L. McBride, Assistant U.S. Attorney. Two witnesses testified at the hearing and three exhibits were received into evidence. Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**<u>RECOMMENDATION</u>**

It is respectfully recommended that Defendant's Motion to Suppress Evidence be denied and the Motion to Suppress Statements be denied as moot.

## JURISDICTION

Defendant is charged in an Indictment with Conspiracy to Distribute a Controlled Substance, in violation of 21 U.S.C. §§ 846, 841(a) and 841(b)(1)(B) and Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Chief Judge Jeffrey L. Viken's Standing Order dated March 9, 2016.

## FACTUAL BACKGROUND

At 1:44 a.m. on May 5, 2015, Officer Brendan McMillan ("McMillan"), Rapid City Police Department ("RCPD"), riding with his field training officer, Officer Chad Sayles ("Sayles"), RCPD, observed a multi-colored, 1990 Acura with one functioning break light and no license plate light, driving eastbound on E. Highway 44 in Rapid City, South Dakota. McMillan and Sayles conducted a traffic stop.[1] (Doc. 54 at p. 7, lines 2-20). For safety reasons, McMillan approached the vehicle from the passenger side. (Doc. 54 at p. 9, line 3). The vehicle was stopped at the intersection of East Highway 44 and South Valley Drive in Rapid City. (Doc. 54 at p. 9, lines 5-6).

Jesse A. Bruce ("Defendant") was driving the vehicle, with one passenger, Dalana Klug ("Klug"). (Doc. 54 at p. 9, lines 21-22). Officer Nicholas Allender ("Allender") and Officer Seth Walker ("Walker") arrived soon thereafter to assist. McMillan asked Defendant for a driver's license, registration, and proof of

---

[1] McMillan testified that the police lights "flooded" the traffic stop area. As a consequence, the video (Exhibit 1) does not accurately depict the unilluminated license plate and dysfunctional break light, because of the police vehicle light's reflection off of Defendant's vehicle.

insurance. (Doc. 54 at p. 10, lines 3-4). Defendant provided a license and registration, but was unable to provide proof of insurance. The vehicle registration indicated that the vehicle belonged to Defendant. (Doc. 54 at p. 10, line 18). Defendant was informed that he would be cited for failure to provide proof of insurance, and his vehicle would be impounded for the same offense.

McMillan returned to his patrol vehicle and began running Defendant's driver's license and vehicle history as per his routine procedure, which revealed that Defendant had previously been cited for operating the same vehicle with no insurance. (Doc. 54 at pp. 11-13). Upon brief conferment with Sayles, Sayles and McMillan decided they were going to issue a citation and tow the vehicle for lack of proof of insurance, as authorized by South Dakota Law.[2] Defendant was cited for failure to provide proof of insurance. Defendant was issued a warning ticket for the two lights. (Doc. 54 at p. 14, line 7). In the course of discussion, Sayles also informed McMillan, that he had previous encounters with Defendant.[3]

Prior to impounding the vehicle, Sayles initiated a conversation with Defendant about where he was coming from. (Doc. 54 at p. 14, lines 15-16).

---

[2] McMillan testified, while they may not always tow a vehicle when a driver fails to provide proof of vehicle insurance, Defendant was unable to provide even a history of proof of insurance, such as a recently expired identification card within the past month or so, further justifying towing the vehicle. Also, McMillan saw that Defendant had been cited in the past resulting in having his vehicle towed.

[3] Sayles testified that he had some encounters with Defendant before – he was familiar with Defendant's face. The nature of these encounters was not, however, clarified in court. Sayles also testified that one thing that came to both his and McMillan's attention was that in April, Defendant had been cited for operating the same vehicle with no insurance, and that the vehicle was towed at that time. (Doc. 54 At p. 57 Lines 14-17).

Sayles asked Defendant to exit the vehicle, and asked Defendant to step near the police vehicle to be questioned about the traffic stop. (Doc. 54 at p. 14, line 18). This questioning entailed general questions. This questioning occurred while McMillan was processing information for the citation. (Doc. 54 at p. 15, lines 2-9). McMillan, who was a new officer, took longer time to process this information. Sayles conducted a "pat-down" of Defendant. A pocket knife and "slim jim"[4] and $700.00 cash money were discovered on Defendant's person. (Doc. 54 at p. 15). Defendant was not arrested at this point, nor was he told he was under arrest. Officers also found two cell phones and a hard drive. Defendant was asked to provide a blood or urine sample, to which he refused. Sayles asked for consent to search the vehicle. (Doc. 54 at p. 16, lines 20-21). Consent was denied. (Doc. 54 at p. 17, line 2). Sayles asked for authorization to bring in a canine. Defendant's initial response was "fairly vague," but then stated, "I wouldn't like it, but you guys are going to do what you are going to do, so 'go ahead.'" (Doc. 54 at p. 17, lines 7-8). McMillan testified that this was understood by the officers to be consent. (Doc. 54 at p. 17, lines 11-14). However, later on in the stop, consent to a canine search was also clearly denied. Sayles released Klug from the scene, informing both Defendant and Klug that the vehicle would be towed for lack of insurance. (Doc. 54 at p. 17, line 22). Defendant was instructed to wait for the completion of the citation

---

[4] McMillan testified that a "slim jim" is a very thin piece of metal with a hook on the end of it, designed for the purpose of entering a vehicle that is locked. It is typically inserted between the window and the door frame of the vehicle to engage the lock mechanism on the inside of the door, allowing entry to the vehicle without a key. If a person is found with a "slim jim," this is, in and of itself, an "arrestable" offense (Possession of Weapons or Tools with Intent to Commit Burglary, in violation of S.D.C.L. § 22-32-17), as this object is commonly known to be used in burglary.

before he was free to go.  (Doc. 54 at p. 17, line 23-24).  Neither Defendant nor Klug was arrested at this point.  (Doc. 54 at pp. 17-18).

Officers Seth Walker ("Walker") and Nicholas Allender ("Allender") arrived at the scene.  (Doc. 54 at p. 20, lines 4-8).  An inventory searched was conducted.  (Doc. 54 at p. 20, line 19).  McMillan testified that the purpose of the inventory search was to identify any valuables in the vehicle as a protection against liability for both the police department and the owner of the vehicle when the third party, tow company, gets involved.  (Doc. 54 at p. 20, lines 21-24).  Sayles and Walker initiated the inventory search.  (Doc. 54 at p. 21, line 8).  McMillan was in the patrol car when this began, around 2:16 A.M.  (Doc. 54 at p. 21, line 10).  McMillan was working on the citation as the search began.  (Doc. 54 at p. 21, lines 20-21).

Sayles conducted the search of the driver's side of the vehicle.  Walker conducted the search of the passenger's side.  Defendant was standing outside of the vehicle with Allender.  (Doc. 54 at p. 22, lines 9-10).  McMillan testified he heard Sayles and Walker say to Allender, "place him in handcuffs and detain him," believing they had located something in the vehicle.  (Doc. 54 at p. 22, lines 11-20).  Sayles found two handguns (Highpoint .45 caliber, and Phoenix Arms .25 caliber) and Walker discovered a digital scale in a backpack.  The digital scale field tested positive for trace of methamphetamine.  (Doc. 54 at p. 23).  McMillan asked Defendant if he had a license for a concealed handgun, further investigating whether or not it was legal for him to own the firearms

5

found underneath the front seat. Defendant indicted that he did not have such license. (Doc. 54 at p. 26, lines 10-17).

Defendant was subsequently placed under arrest for possession of a controlled substance and concealing a firearm without a permit. McMillan testified, on the way to the Pennington County Jail, Defendant did not make any statements, nor were any questions asked of him. A search warrant was then obtained by Seventh Judicial Circuit Court Judge Brown and served at 4:10 a.m. A blood sample was drawn from the Defendant at 4:30 a.m. at the Pennington County Jail.

## **DISCUSSION**

Defendant moves to suppress the search and seizure of items taken from his vehicle and person, and moves to suppress any statements made to law enforcement prior to his arrest. The United States opposes Defendant's motion to suppress statements and evidence.

As a point of clarification, both parties stipulated in open court, "post-arrest" statements are not the subject of this suppression motion, thereby narrowing the scope of this discussion to "pre-arrest" statements. Thus, the following analysis will focus on whether Defendant's "pre-arrest" statements are admissible, as well as any evidence arising out of the traffic stop.

A.   **Traffic Stop and Search**

Defendant argues that RCPD officers did not have probable cause to stop Defendant's vehicle. Therefore, evidence obtained as a result of the illegal traffic stop should be considered inadmissible fruits of that illegal stop.

6

The government argues that the officers had an objectively reasonable basis for believing the driver violated a traffic law, because the vehicle had only one functioning light.  The government further asserts that nothing about the facts of this case show anything other than the officers' objective belief that probable cause existed to show a traffic violation. Therefore, the government believes that the traffic stop was lawful, and forms no basis for suppression of evidence.

1.     **Probable Cause for Traffic Stop**

To determine whether a traffic stop is based on probable cause, or is merely pretextual,[5] an objective, reasonableness standard applies.  Courts are not to consider the motive of the stop as long as the reason for the stop is valid. Whren v. US, 517 US 806, 809 (1996).  Any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver. United States v. Jones, 275 F.3d 673, 680 (8th Cir. 2001).  SDCL § 32-17-8.1 provides that "[e]very motor vehicle shall be equipped with two or more stop lamps … The stop lamp shall display a red light visible from a distance of not less than 300 feet to the rear in normal sunlight.  A violation of this is a petty offense."

McMillan and Sayles were driving eastbound on E. Highway 44, and observed Defendant's 1990, multi-colored Acura driving with only one functioning stop lamp, and an unilluminated license plate.  The court finds

---

[5] Pretextual traffic stops are violation of Fourth Amendment. United States v. Eldridge, 984 F.2d 943 (8th Cir. 1993).

7

McMillan's testimony (Doc. 54 at p. 7, lines 8-14) Lines and Sayles' testimony (Doc. 54 at p. 54, lines 12-17)[6] that the vehicle did not have two working break lights and an unilluminated license plate, credible.  South Dakota law provides that every motor vehicle shall be equipped with two or more stop lamps, displaying a red light visible from a distance of 300 feet.  In applying the objective and reasonable standard, McMillan and Sayles had probable cause to stop Defendant's vehicle, because Defendant's vehicle was not in conformity with South Dakota law.

### 2.    Search of Defendant's Vehicle

In S. Dakota v. Opperman, 428 U.S. 364, 372, (1976), the United States Supreme Court ruled that inventories pursuant to standard procedures are reasonable.  The United States Supreme Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment.  Although automobiles are "effects" and thus within the reach of the Fourth Amendment, Cady v. Dombrowski, 413 U.S. 433, 439, (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not. Opperman, 428 U.S. at 367.

As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order.  Id.  In the interest of public safety and as part of what the United States Supreme Court has called "community

---

[6] Sayles was driving the patrol vehicle on the night of Defendant's arrest.

caretaking functions," Cady v. Dombrowski, supra, 413 U.S. at 441, automobiles are frequently taken into police custody. Id.

The authority of police to seize and remove from the streets, vehicles threatening public safety and convenience is beyond challenge. Id. When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents. S. Dakota v. Opperman, 428 U.S. 364, 369, (1976). These procedures developed in response to three distinct needs; the protection of the owner's property while it remains in police custody, claims or disputes over lost or stolen property, United States v. Kelehar, 470 F.2d 176, 178 (5th Cir. 1972); and the protection of the police from danger, Cooper v. California, 386 U.S., at 61-62, at 790; Opperman, 428 U.S. at 369 (internal citations omitted)

Applying the Fourth Amendment's reasonableness standard, courts have overwhelmingly concluded that, even if an inventory is characterized as a "search," the intrusion is constitutionally permissible. See, Opperman, 428 U.S. at 369.

In the State of South Dakota, every driver or owner of a motor vehicle shall, at all times, maintain in force, one of the forms of financial responsibility on the motor vehicle. SDCL § 32-35-113. If a driver fails to provide evidence of financial responsibility at the time the citation or accident report is issued, the law enforcement officer may issue the driver a citation for violation. SDCL § 32-35-116.

McMillan and Sayles discovered Defendant was driving without proof of financial responsibility on his 1990 Acura, which was registered in his name. A citation was issued for this violation and the decision was made to impound the vehicle. Routine practices of securing inventory were followed. (Doc. 54 at p. 20-22, 65, 69). Law enforcement completed a thorough written vehicle inventory as shown by Exhibit 3. As McMillan testified in court, the purpose of this inventory search was to identify any valuables in the vehicle as a protection against liability for both the police department and the owner of the vehicle, when the third party (towing company) gets involved. (Doc. 54 at p. 20, lines 22-24). Thus, the reasoning behind this search falls directly within the confines of Opperman, rendering the inventory search valid.

### 3. Pre-Arrest Search of Defendant's Person

In Terry v. Ohio, 392 U.S. 1 (1968), the United States Supreme Court stated the basis of what was to become known as a "Terry stop":

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Terry, 392 U.S. at 30. The original "Terry stop" applied to a pedestrian, but courts have expanded the analysis in Terry to apply to vehicle stops, see Ornelas v. United States, 517 U.S. 690, 693 (1996); United States v. Spotts,

275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).

Sayles conducted the "pat-down" search of Defendant. McMillan confirmed that Defendant had been cited in the past and his vehicle had been towed on previous occasions. Based on their experiences as a police officers brief background check on Defendant, the officers could reasonably have concluded that criminal activity may be afoot and Defendant could be presently armed and dangerous. Accordingly, the "pat-down" search was appropriate, and the search of Defendant's person was a permissible Terry search.

**B. Pre-arrest Statements Made by Defendant**

Defendant argues that he was subject to custodial interrogation during the traffic stop without first being advised of his Miranda rights, in violation of Miranda v. Arizona, 384, U.S. 436, 444 (1966). Defendant asserts that he was in custody the second he did not provide proof of insurance at which point he should have been advised of his Miranda warnings. Defendant further argues that initial questioning by officers constituted custodial interrogation, thereby triggering the need to be advised of Miranda warnings.

The government argues, during a traffic stop and prior to an arrest, the requirements of Miranda do not apply. Further, during a lawful traffic stop an officer may conduct a reasonable investigation, including asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions, verifying the driver's identification and related documents, and asking questions about the driver's itinerary. The government further

11

argues, there are no rigid time limits on a traffic stop, and in this case, there was no delay from questioning.

The United States Supreme Court, in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984), addressed the issue of whether a motorist who is made the subject of a traffic stop is "in custody" for purposes of <u>Miranda</u>.[7] After the motorist is formally arrested on a traffic violation, no matter how minor, <u>Miranda</u> warnings are required. <u>Berkemer</u>, 468 U.S. at 434-435. However, during the traffic stop itself and prior to the arrest, <u>Miranda</u> does not apply. <u>Id.</u> at 440-441.

The Eighth Circuit discussed the application of <u>Berkemer</u> to a traffic stop. <u>See United States v. Morse</u>, 569 F.3d 882 (8th Cir. 2009). In <u>Morse</u>, police stopped the vehicle in which the defendant ("Morse") was a passenger. <u>Id</u>. at 883. The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle, incident to arrest. <u>Id</u>. When Morse exited, the officer told Morse he was going to conduct a pat-down search and asked Morse if he had anything on his person the officer should know about. <u>Id</u>. At that point, Morse told the officer he had crack cocaine in his pocket. <u>Id</u>. Morse later moved to suppress his statement and the fruits of the officer's search of his person because the interrogation by the officer was without benefit of the <u>Miranda</u> warnings. <u>Id</u>.

---

[7] Statements obtained from defendants during incommunicado interrogation in police-dominated atmosphere, without full warning of constitutional rights, were inadmissible as having been obtained in violation of Fifth Amendment privilege against self-incrimination. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

The district court, in Morse, granted the motion to suppress, declining to apply the holding of Berkemer because it held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine questioning." Id. At 884. The Eighth Circuit reversed, holding that Berkemer controlled the analysis. Id. at 884-85. The court held that, under Berkemer, the mere fact that Morse did not feel free to leave was not determinative of whether Miranda warnings were required. Id. In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest. Id.

In Illinois v. Caballes, the United States Supreme Court ruled that after an initial stop, the resulting detention must be no longer than reasonably necessary, and must be reasonably related to the circumstances, which initially justified the stop. 543 U.S. 405, 407 (2005); United States v. Sharpe, 470 U.S. 675, 685-687 (1985); Florida v. Royer, 460 U.S. 491, 500 (1983). There are no rigid limitations on a Terry stop. Sharpe, 470 U.S. at 685; United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993). Rather, the court is to consider the purposes for which law enforcement stopped the vehicle, as well as the time reasonably needed to effectuate those purposes. Sharpe, 470 U.S. at 685.

The Court must consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the Defendant. Id. at 686. It is the government's burden to prove that a detention pursuant to reasonable

13

suspicion was sufficiently limited in scope and duration. Royer, 460 U.S. at 500.

The Eighth Circuit has held that a reasonable investigation of a traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, requesting the driver's destination and purpose, and checking to see if there are any outstanding warrants for the driver's arrest. United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2002); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994)); United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (citing United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998)). See also Caballes, 543 U.S. at 407 (a seizure justified by the interest in issuing a ticket to the driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); United States v. Gallardo, 495 F.3d 982 (8th Cir. 2007).

If an officer's permitted initial investigatory steps arouse reasonable suspicions, the officer is "entitled to expand the scope of the stop and ask questions not directly related to the initial stop." Gomez Serena, 368 F.3d at 1040; Jones, 269 F.3d at 925. An investigative stop can grow out of a traffic stop, so long as the officer has reasonable suspicion of criminal activity to expand his investigation, even if his suspicions were unrelated to the traffic offense that served as the basis of the stop. Gomez Serena, 368 F.3d at 1041 (citing United States v. Long, 320 F.3d 795, 799-800 (8th Cir. 2003)).

In Gomez, the defendant was stopped by an officer because the tags on his vehicle appeared to have expired. The officer informed the defendant of the apparent violation, and the defendant responded that there was a temporary license tag in the rear window of the vehicle. The officer confirmed the validity of the temporary tag. The officer then asked the defendant for identification and proof of insurance. The defendant was unable to produce any identification. Upon further questioning of the defendant, the officer became suspicious that the name that the defendant provided did not match the name that was tattooed on the back of the defendant's head. The officer then asked the defendant to look for his proof of insurance, and radioed for assistance. The officer noticed that the defendant was very nervous and fidgeting, with numerous papers in the vehicle, as well as a shaving kit in the front passenger seat of the vehicle.

The officer asked the defendant to step back to the squad car, while he conducted a computer check on the validity of the defendant's driver's license, and to telephone the owner of the vehicle that defendant was driving, to confirm that the defendant had permission to drive the vehicle. The defendant agreed to accompany the officer to his squad car.

The defendant in Gomez contended that once the officer observed the expired temporary tags on his vehicle, the traffic stop should have concluded. In a similar Eighth Circuit case, United States v. Clayborn, the defendant argued that an officer is unable to ask for a driver's license and registration after the reason for the initial traffic stop has concluded. 339 F.3d 700, 701

15

(8th Cir. 2003). The defendant in Clayborn had also been pulled over for driving without a license plates. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2002). The officer, in this case as well, informed the defendant why he had been stopped, and the defendant demonstrated that he had a temporary license tag on the vehicle's rear window. Id. After confirming the license tag, the officer then asked for the defendant's registration papers, insurance card, and driver's license. Id. In both Gomez and Clayborn, the Eighth Circuit reasoned that the officer's request for registration papers and identification was reasonable, and the officer's action did not exceed those justified by the traffic stop. Id. at 1040

The initial questioning of Defendant by McMillan and Sayles was reasonable. RCPD Officers asked Defendant for his drivers' license, registration, and proof of financial responsibility. Upon finding out Defendant did not carry proof of financial responsibility, McMillan and Sayles began writing Defendant a citation, and commenced their standard procedures of impounding Defendant's vehicle, which included a routine inventory search.

As already determined above, the inventory search, as well as the "pat-down" of Defendant, were proper. Upon locating the concealed handguns and drug paraphernalia, law enforcement had reasonable suspicion to expand their investigation. RDCP officers' were entitled to question Defendant about any required permits for the handguns. Allender placed Defendant in handcuffs. McMillan testified that Defendant was not placed under arrest, but was merely detained pending further investigation as to items found in the car, based on

reasonable suspicion that he was involved in further criminal activity based on what they had found.

This court believes this detention was sufficiently limited in scope and duration, and therefore, a <u>Miranda</u> warning was not required at this stage of the traffic stop. Based on the items found from the search of the vehicle and Defendant's person, RCPD officers diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was reasonable to briefly detain Defendant.

Accordingly, the questioning of Defendant during the traffic stop by McMillan and Sayles was reasonable, and therefore, did not require a <u>Miranda</u> warning.

**C.     Post-arrest Statements**

Initially, Defendant sought to have his post-arrest statements suppressed. However, the United States indicated that it does not intend to introduce his post arrest statement in its case in chief. Because the government does not intend to offer the contested evidence at trial, the court need not reach the merits of this motion to suppress. The proper course of action is to deny the motion to suppress, subject to renewal if it becomes necessary. <u>See, eg.</u>, <u>United States v. Lindsey</u>, No. 10-15 (JNE/JJK), 2010 WL 4822925 at *1 (D.Minn. Nov. 22, 2010); <u>United States v. Mitchell</u>, No. 08-CR-46-LRR, 2009 WL 36605 (N.D. Iowa Jan. 5, 2009). It is respectfully recommended that the motion to suppress the post-arrest statements made by Mr. Bruce be denied as moot.

## CONCLUSION

It is respectfully recommended that Defendant's Motion to Suppress Evidence be denied, because evidence from the vehicle was obtained pursuant to a lawful inventory search; evidence from Defendant's person was obtained pursuant to a lawful <u>Terry</u> search; and statements from Defendant were obtained pursuant to a lawful investigatory detention of Defendant based on reasonable suspicion, which was sufficiently limited in scope and duration. It is further recommended that the Defendant's Motion to Suppress Statements be denied as moot.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

DATED this 23rd day of May, 2017.

BY THE COURT:

*[signature]*

DANETA WOLLMANN
United States Magistrate Judge